[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. Background
Plaintiffs Gary J. Pelletier and Louise J. Pelletier have CT Page 2710 brought this action against the Defendants Joseph R. Pelletier, Jr. and Christopher A. Pelletier, doing business as Pelletier Development Company ("PDC")[1] an unincorporated company, to recover damages for defects to the new home constructed for them by the Defendants. The complaint is in five counts, alleging breach of express and implied warranties under the New Home Warranties Act, General Statutes § 47-116, et seq., breach of contract and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), General Statutes § 42-110a, et seq. The Defendants have counterclaimed for sums allegedly owed. Both parties have filed numerous special defenses, essentially alleging a denial of liability and placement of blame on the other.
In addition, the Defendants brought a libel action against the Plaintiffs. That action was consolidated for trial with Plaintiffs' lawsuit. The Defendants withdrew their libel action at the close of the evidentiary portion of the Plaintiffs' lawsuit.
Trial covered 13 trial days from November 8, 1995 to December 15, 1995. Post-trial briefs were due by January 12, 1996, and reply briefs by January 26, 1996. Supplemental briefs, limited to the issue of whether the Plaintiffs qualify as a "purchaser" as defined in § 47-116 of the New Home Warranty Act, were due by February 16, 1996.
Plaintiffs presented as witnesses: the Plaintiffs Gary J. Pelletier and his wife Louise J. Pelletier, the testimony of Gary J. Pelletier consuming the better part of four trial days; Frank Borawski, a structural civil engineer; J. P. Langlois, the Rocky Hill Building Inspector; Patrick Aglieco, a general contractor; and Joseph A. Borcynski, a local real estate appraiser. Defendants presented as witnesses: the Defendant Joseph R. Pelletier, Jr.; James D. Buckley, a general contractor; and James Sakonchick, a professional engineer and land surveyor. The parties entered numerous exhibits.
The premises are now known as No. 97 Fox Hill Drive, Rocky Hill. The building lot upon which the subject home was later constructed was purchased unimproved in February 1992 by the Plaintiffs from a bank in the process of liquidating a subdivision. The lot fronts on the crown of a hill, and slopes significantly to the side and rear. There is a 20 to 25 per cent slope from front to rear, amounting to a drop of approximately 22 CT Page 2711 degrees. Plaintiffs' witness J. P. Langlois described the lot as a "tough site." Plaintiffs' first application for a building permit was denied because the proposed grading was "too steep." Defendants' Exhibit N-1.
The Plaintiffs purchased a set of "canned" house plans through the mail from a company in Idaho. The Plaintiff Gary J. Pelletier,[2] who had some mechanical engineering and design background, adapted the plans to the site. The plans consist of nine sheets. Plaintiffs' Exhibit 2A. With the assistance of an engineer friend, the Plaintiff had prepared the topographical or "A-2" survey required for construction purposes. Plaintiffs' Exhibit 2B. This survey and the elevations and contours depicted thereon apparently were not field verified, but were based upon relevant maps and surveys on file at the Rocky Hill town offices.
The Plaintiffs met the Defendants at a trade show in the Spring of 1992. The Defendant brothers had started their company in 1989. Their business involved construction of single family custom homes of 2,000 to 3,500 square feet on the customer's land, as well as some renovation, additions and rehab work.
The parties entered into a contract, dated June 22, 1992, for construction of the home in accordance with the foregoing plans. The contract was prepared by the Defendants and set a total contract price with allowances of $193,050.00.[3] Certain specialties were not part of Defendants' work. For example, electrical was performed by the Plaintiff, and plumbing and HVAC were separately contracted for by Plaintiffs with other contractors.
Permits, engineering and surveying were the responsibility of the Plaintiffs. The Plaintiffs' revised building permit application had been approved on May 18, 1992. Defendants' Exhibit M. The contract further provided that the Defendants were "to provide structural engineering for foundation due to unusually extreme site conditions." The plans therefor were subsequently prepared by Joseph Sakonchick, an engineer selected by the Defendants, and form part of the contract. Plaintiffs' Exhibit 2C.
Defendants commenced work in late September 1992. Their scheduled start two months earlier was aborted because the Plaintiffs had insufficient fill on site. Plaintiffs had been obtaining fill gratis from the MDC. During construction the CT Page 2712 relationship of the parties had its ups and downs, but not to the extent where either party defaulted the other. The Plaintiff was constantly on site, and videotaped construction progress. His videotape, with audio added, was entered into evidence. Plaintiffs' Exhibit 33.
By May 1993, Defendants' work was substantially completed, to the point where Plaintiffs apparently were preparing to convert their construction financing to a permanent mortgage. The relationship then broke down. First, Plaintiffs had unilaterally withheld one-half of a $48,000.00 payment due Defendants under the contract. Although that issue had been temporarily resolved by a modified payment schedule, Plaintiffs' Exhibit 10, the controversy was such that Defendants ceased work on May 17, 1993.
Under date of May 20, 1993, Plaintiffs sent Defendants a six-page memo of claimed punch list items and claimed contract price adjustments. Plaintiffs' Exhibit 8. On May 27, 1993, Defendants executed and filed a mechanics lien in the amount of $40,336.67. On May 28, 1993, the parties and their attorneys met at the office of Plaintiffs' attorneys. Plaintiffs produced a four-page document setting forth their then claimed construction deficiencies, essentially punch list items, Plaintiffs' Exhibit 14, and Defendants produced a four-page document, Plaintiffs' Exhibit 20, in support of their lien claims.
At that settlement meeting the parties agreed in part as follows: (1) Plaintiffs would pay PDC $17,141.25; (2) the mechanics' lien would be released and a Lien Waiver document would be delivered; and (3) Defendants would deliver to the residence, but not install, a previously ordered carpet for the second floor. However, Plaintiffs refused to accept the carpet when delivered on the ground that it was the wrong color, and by deducting the $2,163.00 cost therefor, paid PDC only $14,978.25. The issue of this carpet is the basis of Defendants' counterclaim.
The settlement was not documented by a signed agreement, nor did the parties exchange releases. Accordingly, each offers a different version of what was agreed concerning the scope of Defendants' obligation, if any, for future corrective work. Defendants contend that the settlement negated any further obligation on their part excepting only for "major catastrophic defects." The Plaintiffs concede that the settlement obviated any further obligation of the Defendants for the items listed on CT Page 2713 Plaintiffs' Exhibits 8 and 14 punch lists, but that Defendants were not released from any defects or issues that might subsequently arise.
The Court finds that the disagreement is one of semantics rather than of substance. As noted below, Defendants have conceded liability for certain claimed defects which, although not "catastrophic", are "major" or more than the touch-up or adjustment items that comprise punch list type defects. Plaintiffs' claims here in issue primarily concern alleged construction defects more serious than punch list items. For example, the minor hump on the second floor mentioned in Plaintiffs' Exhibit 14 has now become a major crowning problem. The Court construes the parties' agreement to have relieved Defendants from further obligation for minor adjustment or touch-up punch list type items, but not for subsequently appearing defects of a major or serious nature.
The Certificate of Occupancy for the dwelling issued under date of June 1, 1993. Defendants' Exhibit O. Plaintiffs have continuously occupied the premises since on or about that time. Plaintiffs continued to assert claimed defects. In July 1992 the Defendants at Plaintiff's request did send an employee to the premises to investigate what turned out to be a nonexistent roof leak. Thereafter, the acrimony between the parties concerning the tenor of Plaintiffs' requests was such that the Defendants did not respond further. A demand letter listing then existing defects was sent by Plaintiffs to the Defendants under date of December 22, 1993. Plaintiffs' Exhibit 29.
In January 1994 the Defendants brought their now withdrawn libel action. In September 1994 the Plaintiffs responded with this lawsuit. As discussed below, the Defendants have conceded liability for certain of the defects claimed by the Plaintiffs.
II. New Home Warranties Act
The First, Second and Fourth Counts of the complaint allege violations of the New Home Warranties Act, General Statutes § 47-116, et seq. Specifically, Plaintiffs claim breach of express warranties under § 47-117(a), and breaches of implied warranties under § 47-118(a) and § 47-121.
The Act sets forth warranties of, and imposes liability on, the builder/vendor of a new home in favor of the original buyer CT Page 2714 of improved real estate. Beckman v. Jalich Homes, Inc., 190 Conn. 299,307 (1983). The Court must first determine whether the Act is applicable under the factual circumstances of this case.
Section 47-116, the definitional section of the Act, provides as follows:
 Sec. 47-116. Definitions. As used in this chapter, unless the context otherwise requires: "Improvement" means any newly constructed single family dwelling unit, any conversion condominium unit being conveyed by the declarant and any fixture or structure which is made a part thereof at the time of construction or conversion by any building contractor, subcontractor or declarant; "purchaser" means the original buyer, his heirs or designated representatives, of any improved real estate; "real estate" means any fee simple estate; and vendor" means any person engaged in the business of erecting or creating an improvement on real estate, any declarant of a conversion condominium, or any person to whom a completed improvement has been granted for resale in the course of his business.
The Defendants, as persons "engaged in the business of erecting or creating an improvement on real estate," clearly qualify as a "vendor." The Plaintiffs' home, being a "newly constructed single family dwelling," clearly qualifies as an "improvement." The issue is whether Plaintiffs qualify as a "purchaser."
The New Home Warranties Act is a remedial statute. As such, it "must be liberally construed in favor of those whom the legislature intended to benefit." Concept Associates Ltd. v.Board of Tax Review, 229 Conn. 618, 623 (1994). However, in statutory interpretation, no word is to be treated as superfluous. Groton v. Yankee Gas Service Co., 224 Conn. 675, 689
(1993). "Generally, no part of a legislative enactment is to be treated as insignificant and unnecessary, and there is a presumption of purpose behind every sentence, clause or phrase."State v. Grant, 176 Conn. 17, 20 (1978). "If the language of the CT Page 2715 statute is clear and unambiguous, it is assumed that the words themselves express the intention of the legislature and there is no room for judicial construction." Elliott v. Sears, Roebuck Co., 229 Conn. 500, 504 (1994).
The Plaintiffs contend that they are within the class of persons protected by the Act. This contention conflicts with the plain language of the Act. Section 47-116 clearly defines a "purchaser" as the "original buyer . . . of any improved real estate." The term "real estate" is defined as "any fee simple estate." The words "fee simple estate" mean a "whole or unlimited estate." Frank Towers Corporation v. Lavinia, 140 Conn. 45, 52
(1953). The Plaintiffs did not purchase improved real estate. There was no conveyance to them of real estate containing the newly constructed improvement. On the contrary, the subject improvement was constructed on real estate already owned by them which they had purchased from a party unrelated to the Defendants.
The Plaintiffs do not qualify as a "purchaser" as defined in the Act. By its terms, the Act applies in situations where the vendor constructs the improvement on real estate owned directly or indirectly by him and conveys the improved real estate to the purchaser. The Act does not apply where a landowner contracts with a builder to construct a new home on real estate already owned by the landowner. Accord: Blonder v. Heath, Superior Court, judicial district of Tolland at Rockville, Docket No. 45252 (September 26, 1990, Jackaway, J.)
This conclusion is supported by the above cited warranty sections or the Act, which clearly speak in terms of contracts of sale, delivery of deeds and taking of possession. These terms presuppose a conveyance of the underlying land together with the new home thereon, such as in the case of tract developments. These terms do not apply in situations such as this where the Plaintiffs already own the real estate upon which the contracted for custom dwelling is to be constructed.
No case has been cited in which the Act was applied to a situation other than one in which the underlying land together with the improvement newly constructed thereon were conveyed by the vendor to the purchaser as a package. Fava v. Arrigoni,35 Conn. Sup. 177 (1979, Sup'r Ct., Rottman, J.), relied upon by the Plaintiffs is inapposite. Fava held that a subcontractor of the then defunct primary contractor-seller was within the definition CT Page 2716 of "vendor" under the predecessor to § 47-116 with respect to that portion of the new home installed by it. In Tessman v. TigerLee Construction Co., 228 Conn. 42 (1993), there was a unity of ownership between the entity that sold the underlying unimproved land to the plaintiffs and the defendants who constructed the new home thereon.
The New Home Warranties Act does not apply in this case. Even if it did, the damages thereunder would be calculated the same as breach of contract damages under the Third Count of complaint.
III. Rule of Damages
"The general rule in breach of contract cases is that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that which he would have been in had the contract been performed." Beckman v.Jalich Homes, Inc., 190 Conn. 299, 309 (1983), citing Lar Rob BusCorporation v. Fairfield, 170 Conn. 397, 404-405 (1976). For breach of a construction contract by the contractor, damages may either be (1) the cost of completion of construction or repair, if that does not involve unreasonable economic waste, or (2) diminution in value of the product. Keppel v. BaRoss Builders,Inc., 7 Conn. App. 435, 438 (1986); Barnicoat v. Edwards, 1 Conn. App. 652,654-55 (1984). Cost of repair is a proper element in determination of diminution of value. Levesque v. D M Builders,Inc., 170 Conn. 177, 182 (1976).
On the issue of cost of repair, Plaintiffs offered the testimony of their contractor witness Aglieco and his report, Plaintiffs' Exhibit 45. The Defendants offered the testimony of their contractor witness Buckley, and his two cost estimate reports. Defendants' Exhibits FF and GG.[4]
On the issue of diminution of value, the Plaintiffs offered the testimony of the appraiser Borcynski, together with his appraisal report. Plaintiffs' Exhibit 47. He determined the value of the premises (land and building) without the claimed defects to be $305,000.00, and with the claimed defects (without regard to fault) $270,000.00, a diminution in value of $35,000.00. He based this diminution on costs of repair derived from a guide commonly used by appraisers totalling (rounded off) $28,000.00. To this, he added a "stigma" factor of $7,500.00 due both to the nature of the defects and to existing building code violations. Excepting for these defects, he found the house to be in good CT Page 2717 condition. Plaintiffs' Exhibit 47, page 1.
The Plaintiff testified that the cost of repair and diminution of value were about the same. Under the circumstances presented, the Court finds that the proper measure of damages is cost of repair plus the "stigma" actor.
IV. Defects/Damages
A. Items For Which Defendants Are Responsible
 1. Garage Floor
The garage floor is a structured slab, containing structured fill underneath the floor. The garage slab was not placed with a proper pitch from back to front, and allows for a major puddle to form in the center. The garage is not separate from the living quarters of the house, but is adjacent to the first floor and beneath the second. The puddling, whether it be from water, snow melt or gasoline leaking from a vehicle, is a dangerous condition. Moreover, wire mesh as required under the slab by the building code is lacking. The Defendants admit liability for this defect.
The Court accepts Plaintiff's expert's opinion on remedy. The floor needs to be jack hammered, structural fill properly compacted, wire mesh and poly installed, and a new properly pitched four inch thick concrete slab installed.
2. Side Porch Slab
The side porch slab contains a number of problems. These include that it is cracked, puddles in the middle, is not pinned to the foundation as required by the plans, and is separating from the foundation. It needs to be removed, properly pinned and replaced.
The Court accepts the testimony of Plaintiffs' expert Aglieco on the cost of correction of the garage floor and side porch slab. This cost amounts to $4,980.00.
3. Basement/Foundation Walls
The basement floor and foundation walls have cracks, and areas of the floor are not level. Wire mesh and a poly vapor CT Page 2718 barrier were not placed in the floor, although these are called for in the contract and plans, and are required by the building code. Areas of exterior parging are defective. The extent of these problems is more than usual in a newly constructed residence. Defendants admit liability for defects to the basement floor.
Plaintiffs' expert Aglieco set the cost of repair at $1,215.00 for basement walls, $1,000.00 for exterior parging and $1,805.00 for leveling the basement floor, totalling $4,020.00, plus $180.00 to correct a problem with a sliding door in the basement, also caused by undue settling. Defendants' expert Buckley set the cost of repair as $240.00 for foundation holes, $340.00 for exterior parging, and $1,765.75 (rounded off by the Court to $1,800.00) for the basement floor, totalling (as rounded off) $2,380.00. Plaintiffs' appraiser expert Borcynski did not consider the basement floor to be a problem with which a prospective buyer would be overly concerned. The Court will accept Buckley's cost estimates of $2,380.00, plus $180.00 for the sliding door, totalling $2,560.00.
4. Sheet Rock
There are serious sheet rock problems involving cracks, corner bends separating, nail pops, poor taping and other defects. The extent of these defects is excessive for a newly constructed residence, and are due to poor workmanship and lack of sufficient heat during installation. Defendants admit liability. Depending on the size of the crew, correction may require two or three weeks. The cost estimate of Defendants' expert Buckley for correction, including repairs, repainting and preparation, including furniture removal, was $4,033.00. The Court finds the cost determination of $8,000.00 of Plaintiffs' expert Aglieco to be more reasonable, and accepts the same.
5. Second Floor Hump
There is a severe hump or crowning on the second floor running all along the steel beam from the front of the house to back. Defendants' expert Buckley's theory that this is caused by normal shrinkage of the wood side wall framing members required by the plans, magnified by the vertical distance covered, and thus a design defect is not accepted. Among other reasons, his theory does not explain why the crowning extends to the front side of the house, or why the hump appeared within a month or so CT Page 2719 of completion of the framing.
The Court accepts the opinion of plaintiffs' expert Borawski that the problem was caused by undue foundation settlement resulting from improper soil preparation or conditions. This is a problem that contributed to the aforementioned sheet rock, garage and basement defects. The Defendants by their contract undertook the provision of foundation structural engineering, and are responsible for this defect.
Considerable correction work will be required. The Court accepts the cost determination of $5,790.00 of Plaintiffs' expert Aglieco.
6. Miscellaneous
The Court determines that $1,000.00 is a reasonable amount to cover miscellaneous items such as the master bedroom shower, interior and deck flooring, and fireplace.
Both Aglieco and Buckley agree that five per cent for overhead and six percent for profit, totalling eleven per cent, should be added for a proper determination of cost of repair.
B. Items For Which Defendants Are Not Responsible
 1. Deck
The wooden deck at the rear of the house sways. Due to the extreme downward slope of the land, the deck stands the equivalent of several stories above grade. The Court concludes, as did Plaintiffs' expert Aglieco, that this is a design problem, and thus not Defendants' responsibility. The plans called for 4' by 4' wooden supports. Defendants' improved on Plaintiffs' plans by using 6' by 6' supports. The erection of concrete columns, in lieu of wooden posts, over this vertical distance, as Plaintiffs' assert, is not feasible. Bracing of the supports, not called for in the plans, was required.
2. Miscellaneous
Plaintiffs have not proved that there are any other defects for which the Defendants are responsible, including those claimed for the driveway, front yard, grading or drainage pipes. CT Page 2720 Plaintiffs also have not proved either the necessity or cost of removal and storage during the period of repairs.
C. Summary of Damages
A summary of the cost of repair is as follows:
 $4,980.00 — Garage and side porch slab 2,560.00 — Basement 8,000.00 — Sheet rock and related items 5,790.00 — Second floor 1,000.00 — Miscellaneous ---------- $22,330.00 — Subtotal 2,456.00 — 11% overhead and profit ---------- $24,786.00 — Cost of repair
To this amount, in order to properly compensate Plaintiffs for their loss, a "stigma" value of $5,000.00 is added. The absence of wire mesh and poly vapor barrier under the basement is a building code violation which now cannot be corrected. Under the Uniform Property Condition Disclosure Act, Public Act 95-311, Plaintiffs will have to disclose this defect, and perhaps also, the extensive corrective work, should they place the premises on the market. As Plaintiffs' expert Borcynski testified, there will be prospective purchasers who will not consider the premises at any price.
Damages are therefore found to be $29,786.00.
V. CUTPA
The Fifth Count of the complaint alleges violation of CUTPA, General Statutes § 42-110a, et seq. Section 42-110b(a) provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." "Whether a practice is unfair and thus violates CUTPA is an issue of fact." Krawiec v. BlakeManor Development Corporation, 26 Conn. App. 601, 607 (1992).
Although Plaintiffs have presented a litany of post facto complaints, the Court finds that they have not sustained their burden of establishing the requisite aggravating circumstances intendant upon a CUTPA violation. Plaintiffs' own experts CT Page 2721 ]confirmed that this was an extremely difficult building site. At best, as stated on page 3 of Plaintiffs' post-trial brief dated January 12, 1996, the Defendants were "in over their heads." This does not rise to the level of a CUTPA violation.
VI. The Counterclaim
The Defendants have counterclaimed for the $2,163.00 deducted by Plaintiffs from the May 28, 1993 settlement payment representing the cost of the carpet refused by the Plaintiffs upon Defendants' delivery of same after that meeting. The Plaintiffs assert that the subject carpet did not conform to the color designated by them. Plaintiffs' Exhibit 23; Defendants' Exhibit V. The Defendants concede that the carpet did not so conform, but claim that it did conform to a color change subsequently made by Plaintiffs.
The alleged color change was not documented by a change order. Other contract changes were so documented by change orders. See, e.g., Plaintiffs' Exhibit 3. The Defendants have not satisfied their burden of proof on this issue.
VII. Judgment
Judgment may enter for Plaintiffs on the Third Count of the Complaint in the amount of $29,786.00. Judgment may enter for the Plaintiffs on the Counterclaim.
DAVID L. FINEBERG SUPERIOR COURT JUDGE